1

2

3

4

5

6

7

8                           UNITED STATES DISTRICT COURT

9                        FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    JUSTM2J LLC,                             No.  2:25-cv-00380-DAD-SCR

12                    Plaintiff,               ORDER DENYING PLAINTIFF'S MOTION
                                               FOR TEMPORARY RESTRAINING ORDER
13            v.                               WITHOUT PREJUDICE AND GRANTING IN
                                               PART PLAINTIFF'S MOTION FOR
14    AYDEN BREWER, et al.,                    EXPEDITED DISCOVERY

15                    Defendants.              (Doc. No. 2)

16    _____

17            This matter is before the court on plaintiff's *ex parte* motion for a temporary restraining

18    order and plaintiff's motion for expedited discovery.  (Doc. No. 2.)  For the reasons explained

19    below, the court will deny plaintiff's motion for a temporary restraining order and will grant in

20    part plaintiff's motion for expedited discovery.

21                                        **BACKGROUND**

22            On January 27, 2025, plaintiff JustM2J LLC initiated this fraud action against named

23    defendants Ayden Brewer, Jon Litz, and Jason St. George, and unknown defendant John Doe 1.

24    (Doc. No. 1.)  In its complaint, plaintiff alleges the following.

25            Plaintiff is a Delaware limited liability company that is the assignee of all claims

26    belonging to Nakamoto LLC related to a series of cyber-attacks ("the Bittensor attacks") against

27    the participants of Bittensor.  (*Id.* at ¶¶ 1, 10.)  Nakamoto LLC, as the assignor of plaintiff,

28    /////

                                                    1

purportedly lost approximately $13,000,000 in crypto assets as a result of the Bittensor attacks.[1]

(*Id.* at ¶ 6.)  Bittensor is a decentralized network that is designed to foster collaboration and competition among AI researchers.  (*Id.* at ¶ 21.)  It does this by allowing participants to earn rewards in the form of a digital token called TAO for providing computations and machine learning models aimed at completing certain tasks, such as image recognition.  (*Id.*)  Bittensor is open-source in that its source code is freely available to the public.  (*Id.*)  To participate in Bittensor, participants must have a piece of software called a wallet which enables them to receive, store, and transfer TAO and a private key that allows a user to access and control a wallet and its contents.  (*Id.* at ¶ 24.)  Defendant St. George was an employee of Opentensor Foundation ("Opentensor"), which maintains, develops, and improves Bittensor.  (*Id.* at ¶¶ 25, 27.)  During his tenure there, defendant St. George had access to Opentensor's proprietary key which allowed access to Opentensor's PyPI account.[2]  (*Id.* at ¶ 27.)  Defendants Brewer, St. George, Litz, and John Doe 1 entered into an agreement to plan and execute the Bittensor attacks around April of 2024.  (*Id.* at ¶ 28.)  On May 20, 2024, defendants registered a domain named opentensor.io which appeared as though it belonged to Opentensor.  (*Id.* at ¶ 29.)

On May 22, 2024, Opentensor released an upgrade to Bittensor's software called version 6.12.2.  (*Id.* at ¶ 30.)  This release first took place on Github, which is an open-source code repository that Opentensor uses for Bittensor.  (*Id.*)  This release was also intended to be published on PyPI by Opentensor.  (*Id.* at ¶ 31.)  However, defendants used the proprietary Opentensor key to upload a malicious version of the Bittensor update.  (*Id.*)  This prevented the upload of the legitimate version 6.12.2 of Bittensor to PyPI by Opentensor.  (*Id.*)  Bittensor users who downloaded version 6.12.2 from PyPI prior to July 2, 2024, therefore received a malicious

---

[1]  Neither in its complaint nor in the pending *ex parte* motion for a temporary restraining order does plaintiff address how or why Nakamoto LLC assigned its claims in this regard to plaintiff nor does plaintiff explain the nature of the relationship between itself and Nakamoto LLC.

[2]  Plaintiff's allegations with respect to the PyPI account are vague and unclear.  It may be that plaintiff is attempting to allege that Opentensor has an account on PyPI that it uses to upload updates to its Bittensor software as packages and that defendants improperly gained access to the login credentials for that account.

1   version of the update which executed the same functions but also intercepted private keys

2   associated with the wallets of those users and sent those keys to opentensor.io.  (*Id.* at ¶ 33.)  On

3   May 30, defendants used one private key obtained in this manner to steal a total of 1039.9 TAO

4   from the wallets of one user, amounting to roughly $480,000.  (*Id.* at ¶ 35.)  On June 1,

5   defendants used a different private key obtained in this manner to steal a total of 28,368 TAO

6   from Nakamoto's wallet, amounting to roughly $13,000,000.  (*Id.* at ¶ 36.)  On July 2, defendants

7   transferred 32,395 TAO, valued at approximately $15,000,000, from the wallets of 30 users.  (*Id.*

8   at ¶ 37.)

9        Opentensor then placed the Bittensor network in safe mode and on July 3 discovered that

10   the malicious version that had been uploaded to PyPI.  (*Id.* at ¶¶ 38, 39.)  A series of transfers and

11   exchanges occurred which caused the assets taken in these three attacks to be deposited into

12   specific wallet addresses ("the Destination Addresses") across several exchanges.  (*Id.* at ¶¶ 41,

13   42.)  Plaintiff does not allege when these transfers occurred.  Opentensor retained a forensic

14   investigator and contacted law enforcement regarding the Bittensor attacks, though plaintiff does

15   not allege when the investigation conducted by the forensic investigator was completed.  (*Id.* at ¶

16   40.)  Plaintiff has provided a declaration attached to its *ex parte* motion for a temporary

17   restraining order which states that the forensic investigator was hired in July 2024.  (Doc. No. 2-2

18   at ¶ 6.)

19        Assets from the May 30 cyberattack, amounting to 1030.9 TAO, were transferred to the

20   TAO-wTAO bridge which allows users to convert TAO to wTAO, a separate cryptocurrency.

21   (Doc. No. 1 at ¶ 43.)  Those wTAO assets were then converted to Ethereum ("ETH"), a separate

22   cryptocurrency, and deposited into the following cryptocurrency wallet addresses:

23

| Cryptocurrency and Volume | Destination Address | Address Type | USD Value[3] |
|---|---|---|---|
| **103 ETH** | 0x5e92aB69eB102cFC4A7 C507D8Dc3cC1eEdE25Eb0 | WhiteBit Deposit | $412,206 |

---

[3]  Plaintiff represents that the value of the funds located in each of the destination addresses listed in this order were calculated using the peak ETH/USD conversion rate over the past thirty (30) days.  (Doc. No. 1 at 9 n.1.)

| Cryptocurrency and Volume | Destination Address | Address Type | USD Value[3] |
|---|---|---|---|
| | | Address | |
| **.884 ETH** | 0x09F76d4FC3bcE5bF2854 3F45c4CeE9999E0a0AAf | June 1, 2024 Hack Address | $3,537 |

(*Id.* at ¶ 46.)[4]

According to plaintiff, assets from the June 1 attack, amounting to 28,368 TAO, were transferred to the TAO-wTAO bridge and temporarily deposited to the wallet address identified as the traced endpoint for the .884 ETH taken in the May 30 attack. (*Id.* at ¶ 47.) Those wTAO assets were then exchanged for ETH, wETH, a separate cryptocurrency, and USD Coin. (*Id.* at ¶ 48.) USD Coin is a stablecoin cryptocurrency designed to maintain a 1:1 conversion rate with USD. (*Id.* at 9 at n.2.) Those assets were then distributed over several deposit addresses in Binance, WhiteBit, and HTX, which are exchanges used to store and trade cryptocurrencies. (*Id.* at ¶ 49.) Approximately 1,205 ETH from those assets was routed through the Railgun Privacy Protocol, which is a system designed to hide the details of cryptocurrency transactions. (*Id.* at ¶ 51.) Plaintiff claims that 1,055 ETH was transferred from the Railgun Privacy Protocol to the Synapse Protocol bridge, a tool used to transfer cryptocurrency assets between different blockchains, and then transferred to a variety of cryptocurrency exchanges while the remaining 150 ETH was sent to two specific deposit addresses. (*Id.* at ¶¶ 52, 53.) The mixture of assets obtained as a result of the June 1 attack, according to plaintiff, reached the following ending wallet addresses:

| Cryptocurrency and Volume | Destination Address | Address Type | USD Value |
|---|---|---|---|
| **395,301 USDC** | 0x8f3100AD91cbfbE8aA58 845083B25249f8FfdB29 | Binance Deposit Address | $395,301 |
| **197,336 USDC** | 0x9C6D589B7e6Cea55138A 3ea1E0AC615126290ED2 | Binance Deposit Address | $197,336 |

---

[4]  Though plaintiff alleges that the value of the assets taken amounted to approximately $480,000, the amount in the Destination Addresses listed only adds up to $415,743.  Plaintiff does not clarify this discrepancy in its complaint.

| Cryptocurrency and Volume | Destination Address | Address Type | USD Value |
|---|---|---|---|
| **99.9999 ETH** | 0x9C6D589B7e6Cea55138A3ea1E0AC615126290ED2 | Binance Deposit Address | $396,198 |
| **98.9997 ETH** | 0x6C030fCf0529baa3FB65532a25aB5154BBE335cB | WhiteBit Deposit Address | $396,157 |
| **384,192 USDC** | 0x5625f748FF2E0784744a4F974d173924D7219097 | WhiteBit Deposit Address | $384,192 |
| **63.9997 ETH** | 0x047050a2A09dc27f23Df519dF7D19074A6a3343f | WhiteBit Deposit Address | $256,087 |
| **153.9994 ETH** | 0x15a8130D8F8AcD4744867b3D51491D1e0189f908 | WhiteBit Deposit Address | $616,267 |
| **86.9996 ETH** | 0x65a7437f2F6EF3c203b19af8f1787Db03F1FB20B | WhiteBit Deposit Address | $348,133 |
| **24.9995 ETH** | 0x954f0dF9B7555a755CFd855Bf4809c4e15b732B0 | WhiteBit Deposit Address | $100,009 |
| **25 ETH** | 0x6d5f108E94718e346C5eC1C52cE7edd5cDD1a89A | WhiteBit Deposit Address | $100,050 |
| **20 ETH** | 0xe6a2aAE8811c20869a9002A808b7c31a0786588E | WhiteBit Deposit Address | $80,040 |
| **28.9 ETH** | 0xBc9b0B672f8941109Ff37831fa43c922B0935d17 | WhiteBit Deposit Address | $115,657 |
| **24.9997 ETH** | 0x56DbE5de6a37f23e85DA00338e1dd58216a40b6c | HTX Deposit Address | $100,009 |
| **99.9996 ETH** | 0x3A9EDb8C26c61F816DeAcE92764964bb1483456E | HTX Deposit Address | $396,198 |
| **63.9998 ETH** | 0x58A6cfc6D9b00E78056f62D8a1efa54741AcEe01 | HTX Deposit Address | $256,087 |
| **74.9998 ETH** | 0x01d2B465d5ba513387932290fe1a1644d5A83F22 | HTX Deposit Address | $300,145 |
| **77.9998 ETH** | 0x80839E957F5BC7D72e71626636C5FAE202B758e7 | HTX Deposit Address | $312,151 |
| **99.9996 ETH** | 0x8C227480B8F9E894a572687799FE5368622FCDC1 | HTX Deposit Address | $396,198 |
| **85.9997 ETH** | 0x7824ee032bd857FbbDd9e351F50F5eB80b0ADB13 | HTX Deposit Address | $344,167 |

| Cryptocurrency and Volume | Destination Address | Address Type | USD Value |
|---|---|---|---|
| 99.9999 ETH | 0x6BEe51F3cf378Fc167DFe eF1ea2c856ce6Ec12d8 | KuCoin Deposit Address | $396,198 |
| 99.9999 ETH | 0x3898879e531D2ce92d8FB 23cb7aD86d5472060C1 | KuCoin Deposit Address | $396,198 |
| 1.999904 ETH | 0xb3C7E5E8F138F23C461 C941AF133BC14F863285E | KuCoin Deposit Address | $7,999 |
| 19.9998 ETH | 0x95034c37c1C1D8484089Fb468899 32402DCA0F82 | KuCoin Deposit Address | $80,035 |
| 9.999985 ETH | 0x85De72B97d6eFe7bFCDa C472fA182F79Da8619DC | KuCoin Deposit Address | $40,015 |
| 9.99987 ETH | 0x91aC15FE89315867F8BD d7b5bB40D450E2fF0320 | KuCoin Deposit Address | $40,015 |
| 4.999909 ETH | 0x9f02577718bA0505DbB0 7a13eCc38d809b13399a | KuCoin Deposit Address | $20,005 |
| 50 ETH | 0x26658c8e719268e473491 E26E5a33e284d1Ea4bF | MexC Deposit Address | $200,100 |
| 50 ETH | 0xC49BDbD2F3ed50cD095 B108bca6bd7596F2D4ba7 | EXCH.CX Deposit Address | $200,100 |
| 35 ETH | 0xD66766E43cB66628478E d9D12d076849e81fDfF5 | EXCH.CX Deposit Address | $140,070 |
| 228 ETH | 0x85E14ec0E976414EDE6B 38A0b5E5B7879290EF53 | EXCH.CX Deposit Address | $912,456 |
| 100 ETH | 0xCAec170151ABaED4Fc3 a158a7c3f78889C0dD9e5 | EXCH.CX Deposit Address | $400,200 |
| 20 ETH | 0xDcDEA8a8cAB06958C59 0E64937c0D4853744c335 | EXCH.CX Deposit Address | $80,040 |
| 14.9999 ETH | 0x356E2Df6a43A26E340Da e0C3649c26aCcf384082 | EXCH.CX Deposit Address | $59,989 |
| 10.0001 ETH | 0x686Fa4976D8C7EA5BCA c53EB86ea453c44f7c5f3 | EXCH.CX Deposit Address | $40,020 |
| 9.999857 ETH | 0x79Ce9C4160F4AAf5191f C516511c78D0dd24e885 | EXCH.CX Deposit Address | $40,015 |
| 9.999908 ETH | 0x08e637130C4eFBb4e48D C13Cc95c7fC6355A3BdB | EXCH.CX Deposit Address | $40,015 |

6

| Cryptocurrency and Volume | Destination Address | Address Type | USD Value |
|---|---|---|---|
| **4.999893 ETH** | 0x34A64406Eb3FBc18994C 7B2827E5D266671d011D | EXCH.CX Deposit Address | $20,005 |
| **4.999963 ETH** | 0x22Cb8d3A6D43F86DCB E751e4a2cf235ba1312b79 | EXCH.CX Deposit Address | $20,005 |
| **4.999964 ETH** | 0x16929803A0F2392497C8 1404d7748c65ff9C0c2a | EXCH.CX Deposit Address | $20,005 |
| **4.999968 ETH** | 0x0eC0AC79148305FE8177 45C18c0aF4Ba07547B98 | EXCH.CX Deposit Address | $20,005 |
| **4.99995 ETH** | 0xF239a90A91e4598b541D7D78bea E3621193b9c9D | EXCH.CX Deposit Address | $20,005 |
| **4.999953 ETH** | 0x292685ac52Bdb8fa08aCB 50Da3801bd87C4137AF | EXCH.CX Deposit Address | $20,005 |
| **4.999963 ETH** | 0xFF506cD2A2bFDFA80EF 62DC22839E16ce40CA4F5 | EXCH.CX Deposit Address | $20,005 |
| **4.999968 ETH** | 0xA4F75e61cdAd561bdDD 35e921288bd60002f9633 | EXCH.CX Deposit Address | $20,005 |
| **4.999952 ETH** | 0x7DA771ec163C461adec0 9ED2D88f2A5ec62Ff13D | EXCH.CX Deposit Address | $20,005 |
| **4.99986 ETH** | 0xbaE5d5c76c42D93CE658 28E9B0c86458Dc5329A7 | EXCH.CX Deposit Address | $20,005 |
| **4.999851 ETH** | 0x18c7278D515EF9601191 48a0c5228718281fC312 | EXCH.CX Deposit Address | $20,005 |
| **9.9999 ETH** | 0xfffDEc00c2DD485bFfEde c4eF65489D1F076E1a1 | Exolix Deposit Address | $40,015 |
| **49.999678 ETH** | 0x47713cb34FAbd63b39D7 C5c6f675dCa39d22762B | Unnamed Service | $200,095 |
| **1.999818 ETH** | 0x47713cb34FAbd63b39D7 C5c6f675dCa39d22762B | Unnamed Service | $7,999 |
| **.999823 ETH** | 0x47713cb34FAbd63b39D7 C5c6f675dCa39d22762B | Unnamed Service | $3,997 |
| **277,906 USDC** | 0xFA7093CDD9EE6932B4e b2c9e1cde7CE00B1FA4b9 | Railgun.ch Privacy Protocol | $277,906 |
| **22.41 wETH** | 0xFA7093CDD9EE6932B4e b2c9e1cde7CE00B1FA4b9 | Railgun.ch Privacy Protocol | $97,688 |
| **10 ETH** | 0x252262813114eB1FF5261 E2408B39410a5a8dCCB | Link Address | $40,020 |
|  |  |  |  |

| Cryptocurrency and Volume | Destination Address | Address Type | USD Value |
|---|---|---|---|
| **300,000 USDC** | 0xd5960CA93A0b3fEE31a6 B691BCA27e5C36701B83 | Coinbase Deposit Address | $300,000 |

(*Id.* at ¶ 54.)[5]

In addition according to plaintiff, assets from the July 2 attack, amounting to 32,395 TAO, were consolidated in a single Bittensor wallet. (*Id.* at ¶ 55.) Those assets were then transferred to a KuCoin or MexC deposit address, both of which are separate cryptocurrency exchanges, or routed through the TAO-wTAO bridge to the Railgun Privacy Protocol, at which point the assets became untraceable. (*Id.* at ¶¶ 51, 55, 56.) The last known location of those assets are the following deposit addresses:

| Cryptocurrency and Volume | Destination Address | Address Type | USD Value |
|---|---|---|---|
| **8,295 TAO** | 5CrmVKApX6sJybZaL1geHfz vHWeCpbavqrrXgYLCQmheh X2q | KuCoin | $4,587,135 |
| **11,100 TAO** | 5FqBL928choLPmeFz5UVAv onBD5k7K2mZSXVC9RkFzL xoy2s | MexC | $6,105,000 |
| **333.621 ETH** | 0xFA7093CDD9EE6932B4eb 2c9e1cde7CE00B1FA4b9 | Railgun.ch Privacy Protocol | $1,335,151 |

(*Id.* at ¶ 57.)[6]

Based upon these allegations, plaintiff asserts seven claims against the defendants: (1) accessing protected computers without authorization and causing damage or loss in violation of the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030(a)(2)(C), 1030(a)(4) and 1030(a)(5)(C); (2) intercepting electronic communications by Bittensor participants in violation of the Wiretap Act, 18 U.S.C. § 2510, *et seq.*; (3) fraud; (4) conversion; (5) unjust enrichment; (6) imposition of

---

[5] Though plaintiff alleges that the value of the assets taken amounted to approximately $13,000,000, the amount in the Destination Addresses adds up only to $9,659,612. Plaintiff also does not clarify this discrepancy in its complaint.

[6] Though plaintiff alleges that the value of the assets taken amounted to approximately $15,000,000, the amount in the Destination Addresses adds up only to $12,027,286. Plaintiff also does not clarify this discrepancy in its complaint.

8

1   a constructive trust and disgorgement of funds; and (7) possession of stolen property in violation

2   of California Penal Code § 496.  (Doc. No. 1 at ¶¶ 71–113.)

3           Plaintiff filed the pending *ex parte* motion for a temporary restraining order with its

4   complaint.  (Doc. No. 2.)  In that *ex parte* motion, plaintiff seeks an order from this court freezing

5   accounts that received allegedly stolen digital assets, including the assets held in the Destination

6   Addresses of the assets taken in the Bittensor cyberattacks, and other related digital accounts

7   maintained by defendants purportedly in order to preserve the *status quo* during the litigation of

8   this action.  (Doc. No. 2-1 at 7.)  Defendants also request authorization to conduct limited

9   expedited discovery to identify the "John Doe" defendant(s) and confirm the location of stolen

10   assets.  (*Id.* at 7.)

11                                 **LEGAL STANDARD**

12   **A.      Temporary Restraining Order**

13           The standard governing the issuing of a temporary restraining order is "substantially

14   identical" to the standard for issuing a preliminary injunction.  *See Stuhlbarg Int'l Sales Co. v.*

15   *John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001).  "The proper legal standard for

16   preliminary injunctive relief requires a party to demonstrate 'that he is likely to succeed on the

17   merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the

18   balance of equities tips in his favor, and that an injunction is in the public interest.'"  *Stormans,*

19   *Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (quoting *Winter v. Nat. Res. Def. Council,*

20   *Inc.*, 555 U.S. 7, 20 (2008)); *see also Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1172 (9th

21   Cir. 2011) ("After *Winter*, 'plaintiffs must establish that irreparable harm is likely, not just

22   possible, in order to obtain a preliminary injunction.'"); *Am. Trucking Ass'ns v. City of Los*

23   *Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009).  A plaintiff seeking a preliminary injunction must

24   make a showing on all four of these prongs.  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127,

25   1135 (9th Cir. 2011).  The Ninth Circuit has also held that "[a] preliminary injunction is

26   appropriate when a plaintiff demonstrates . . . that serious questions going to the merits were

27   raised and the balance of hardships tips sharply in the plaintiff's favor."  *Id.* at 1134–35 (quoting

28   /////

1  *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (*en banc*)).[7]  The party seeking the

2  injunction bears the burden of proving these elements.  *Klein v. City of San Clemente*, 584 F.3d

3  1196, 1201 (9th Cir. 2009); *see also Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674

4  (9th Cir. 1988) (citation omitted) ("A plaintiff must do more than merely allege imminent harm

5  sufficient to establish standing; a plaintiff must *demonstrate* immediate threatened injury as a

6  prerequisite to preliminary injunctive relief.").  Finally, an injunction is "an extraordinary remedy

7  that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."

8  *Winter*, 555 U.S. at 22.

9      Relevant to the court's consideration of plaintiff's pending *ex parte* motion, a court may

10  only issue a temporary restraining order without notice to the adverse party when:

11      (A) specific facts in an affidavit or a verified complaint clearly show
        that immediate and irreparable injury, loss, or damage will result to
12      the movant before the adverse party can be heard in opposition [and]
        (B) the movant's attorney certifies in writing any efforts made to give
13      notice and the reasons why it should not be required.

14

15  Fed. R. Civ. P. 65(b)(1).  Moreover, *ex parte* temporary restraining orders "should be restricted to

16  serving their underlying purpose of preserving the *status quo* and preventing irreparable harm just

17  so long as is necessary to hold a hearing, and no longer."  *Granny Goose Foods, Inc. v. Bhd. of*

18  *Teamsters & Auto Truck Drivers Loc. No. 70 of Alameda Cnty.*, 415 U.S. 423, 439 (1974).

19  **B.    Expedited Discovery**

20      Federal Rule of Civil Procedure Rule 26(d) provides that no discovery can be sought

21  "from any source before the parties have conferred as required by Rule 26(f), except . . . when

22  authorized . . . by court order."  Fed. R. Civ. P. 26(d)(1).  Generally, courts require a showing of

23  good cause to permit expedited discovery.  *In re Countrywide Fin. Corp. Derivative Litig.*, 542 F.

24  Supp. 2d 1160, 1179 (C.D. Cal. 2008), *abrogated on other grounds by United States v. State*

---

[7]  The Ninth Circuit has found that this "serious question" version of the circuit's sliding scale
approach survives "when applied as part of the four-element *Winter* test."  *All. for the Wild
Rockies*, 632 F.3d at 1134.  "That is, 'serious questions going to the merits' and a balance of
hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction,
so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the
injunction is in the public interest."  *Id.* at 1135.

1   *Water Res. Control Bd.*, 988 F.3d 1194, 1205 (9th Cir. 2021); *Criswell v. Boudreaux*, No. 1:20-

2   cv-01048-DAD-SAB, 2020 WL 5235675, at *25 (E.D. Cal. Sept. 2, 2020).  "Good cause may be

3   found where the need for expedited discovery, in consideration of the administration of justice,

4   outweighs the prejudice to the responding party."  *Semitool, Inc. v. Tokyo Electron Am., Inc.*, 208

5   F.R.D. 273, 276 (N.D. Cal. 2002).  In determining whether good cause exists, courts consider:

6   "(1) whether a preliminary injunction is pending; (2) the breadth of the discovery request; (3) the

7   purpose for requesting the expedited discovery; (4) the burden on the defendants to comply with

8   the requests; and (5) how far in advance of the typical discovery process the request was made."

9   *Rovio Ent. Ltd. v. Royal Plush Toys, Inc.*, 907 F. Supp. 2d 1086, 1099 (N.D. Cal. 2012).

10           Applying the test set forth in *Semitool*, California district courts have found good cause to

11   authorize expedited discovery to ascertain the identity of an unknown defendant.  *See, e.g.*, *AF*

12   *Holdings LLC v. Doe*, No. 2:12-cv-02207-KJM-DAD, 2012 WL 6608993, at *1 (E.D. Cal. Dec.

13   18, 2012) (granting leave to conduct expedited discovery to determine the identity of a Doe

14   defendant in a copyright infringement action); *First Time Videos, LLC v. Doe*, No. 2:12-cv-

15   00621-GEB-EFB, 2012 WL 1355725 (E.D. Cal. Apr. 18, 2012) (same); *UMG Recordings, Inc. v.*

16   *Doe*, No. 08-cv-03999-RMW, 2008 WL 4104207 (N.D. Cal. Sept. 4, 2008) (same); *Arista Recs.*

17   *LLC v. Does 1–43*, No. 07-cv-02357-LAB-POR, 2007 WL 4538697 (S.D. Cal. Dec. 20, 2007)

18   (same).  Moreover, the Ninth Circuit has held that "'where the identity of the alleged defendant[ ]

19   [is] not [ ] known prior to the filing of a complaint[,] the plaintiff should be given an opportunity

20   through discovery to identify the unknown defendants, unless it is clear that discovery would not

21   uncover the identities, or that the complaint would be dismissed on other grounds.'"  *Wakefield v.*

22   *Thompson*, 177 F.3d 1160, 1163 (9th Cir. 1999) (alteration in original) (quoting *Gillespie v.*

23   *Civiletti*, 629 F.2d 637, 642 (9th Cir. 1980)).

24           To determine whether a plaintiff has established good cause to seek the identity of a Doe

25   defendant through expedited discovery, courts consider the following:

26           whether the plaintiff (1) identifies the Doe defendant with sufficient
             specificity that the Court can determine that the defendant is a real
27           person who can be sued in federal court, (2) recounts the steps taken
             to locate and identify the defendant, (3) demonstrates that the action
28           can withstand a motion to dismiss, and (4) proves that the discovery

is likely to lead to identifying information that will permit service of process.

*ZG TOP Tech. Co. v. Doe*, No. 19-cv-00092-RAJ, 2019 WL 917418, at *2 (W.D. Wash. Feb. 25, 2019) (citing *Bodyguard Prods., Inc. v. Doe 1*, 17-cv-01647-RSM, 2018 WL 1470873, at *1 (W.D. Wash. Mar. 26, 2018)); *see also Columbia Ins. Co. v. seescandy.com*, 185 F.R.D. 573, 578–80 (N.D. Cal. 1999).

## DISCUSSION

Below, the court first analyzes whether plaintiff has met its burden under Rule 65(b)(1)(b) to justify the granting of an *ex parte* temporary restraining order in this case. The court then addresses whether plaintiff has met its burden of demonstrating an irreparable injury which would warrant the granting of the requested relief. Finally, the court considers whether plaintiff has adequately supported its request for the authorization of expedited discovery to attempt to discover the identities of Doe defendant(s).

### A.    Rule 65 Notice

As addressed above, a temporary restraining order may be issued without notice to the adverse party or its attorney only under strictly limited circumstances. Fed. R. Civ. P. 65(b)(1); *see also* L.R. 231(a) ("Except in the most *extraordinary of circumstances*, no temporary restraining order shall be granted in the absence of actual notice to the affected party and/or counsel, by telephone or other means, or a sufficient showing of efforts made to provide notice.") (emphasis added). The Supreme Court has emphasized, an *ex parte* temporary restraining order is justified only in very limited circumstances:

> The stringent restrictions imposed . . . by Rule 65 on the availability of ex parte temporary restraining orders reflect the fact that our entire jurisprudence runs counter to the notion of court action taken before reasonable notice and an opportunity to be heard has been granted both sides of a dispute. *Ex parte* temporary restraining orders are no doubt necessary in certain circumstances, but under federal law they should be restricted to serving their underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer.

*Granny Goose Foods, Inc.*, 415 U.S. at 438–39 (internal citation omitted); *McZeal v. EMC Mortg. Corp.*, No. 13-cv-07220-MMM-CW, 2013 WL 12138853, at *1 n. 3 (C.D. Cal. Nov. 4, 2013)

1    ("Only in rare circumstances can a federal court issue a TRO without written or oral notice to the

2    adverse party.").  "In cases where notice could have been given to the adverse party, courts have

3    recognized 'a very narrow band of cases in which *ex parte* orders are proper because notice to the

4    defendant would render fruitless the further prosecution of the action.'"  *Reno Air Racing Ass'n,*

5    *Inc. v. McCord*, 452 F.3d 1126, 1131 (9th Cir. 2006) (quoting *Am. Can Co. v. Mansukhani*, 742

6    F.2d 314, 322 (7th Cir. 1984)); *see also Harnden v. Perez*, No. 21-cv-09231-LHK, 2021 WL

7    7367123, at *3 (N.D. Cal. Dec. 8, 2021).

8          Here, plaintiff's counsel has submitted an affidavit pursuant to Rule 65(b)(1)(b) stating

9    that providing advance notice to defendants in this case would make it highly likely that they

10    would move the assets at issue out of the reach of this court.  (Doc. No. 2-3 at ¶ 4.)  The court

11    acknowledges that cryptocurrency such as that at issue here "poses a heightened risk of asset

12    dissipation."  *FTC v. Dluca*, No. 18-cv-60379-LSS, 2018 WL 1830800, at *2–3 (S.D. Fla. Feb.

13    28, 2018) ("[C]ryptocurrencies are circulated through a decentralized computer network, without

14    relying on traditional banking institutions or other clearinghouses.  This independence from

15    traditional custodians makes it difficult for law enforcement to trace or freeze cryptocurrencies in

16    the event of fraud or theft[]"), *report and recommendation adopted*, No. 18-cv-60379-KMM-

17    LSS, 2018 WL 1811904 (S.D. Fla. Mar. 12, 2018).  However, "a single conclusory statement by

18    counsel about" what defendants may do is insufficient to meet the requirements of Rule

19    65(b)(1)(b).  *Reno Air Racing Ass'n., Inc.*, 452 F.3d at 1132 ("Were a single conclusory statement

20    by counsel about infringers sufficient to meet the dictates of Rule 65, then *ex parte* orders without

21    notice would be the norm and this practice would essentially gut Rule 65's notice

22    requirements.").  Here, the bare statement by plaintiff's counsel that defendants are likely to

23    immediately move the cryptocurrency assets at issue in this action through channels designed to

24    prevent tracing of those assets is unsupported by evidence and is insufficient to justify the

25    granting of *ex parte* relief.  *See Nexon Am. Inc. v. GK*, No. 5:21-cv-00886-JWH, 2021 WL

26    9315450, at *3 (C.D. Cal. Sept. 2, 2021) (finding that the plaintiff's assertion that the defendants

27    "most certainly will move assets to other accounts" upon notice was insufficient to support the

28    issuance of an *ex parte* temporary restraining order).

13

1    To support its contention that defendants will immediately begin transferring assets,

2  plaintiff also provides a declaration from Adam Zarazinski ("the Zarazinski declaration"), the

3  CEO of a financial intelligence company who has developed expertise in financial data analysis,

4  digital forensics, and cryptocurrency.  (Doc. No. 2-2 at ¶¶ 2, 3.)  The declaration was prepared

5  after the declarant was hired by Opentensor to investigate the Bittensor attacks.  (*Id.* at ¶ 6.)  In it,

6  Mr. Zarazinski indicates that defendants' actions are consistent with illicit actors in

7  cryptocurrency fraud cases.  (*Id.* at ¶ 38.)  He declares that in his experience, "advance notice to

8  cryptocurrency thieves of legal proceedings typically results in immediate attempts to move

9  assets[.]"  (*Id.* at ¶ 39.)

10    However, a plaintiff seeking *ex parte* relief on the basis that the adverse party will transfer

11  assets must support that assertion by, for instance, showing that the adverse party has a history of

12  disregarding court orders or that persons similar to the adverse party have such a history.  *See*

13  *Adobe Sys., Inc. v. S. Sun Prods., Inc.*, 187 F.R.D. 636, 640 (S.D. Cal. 1999) (discussing how, in

14  order to justify proceeding *ex parte*, the plaintiff was required to show that the defendants would

15  have disregarded a court order and destroyed evidence within the time it would take to hold a

16  hearing) (citing *First Tech. Safety Sys., Inc. v. Depinet*, 11 F.3d 641, 650–51 (6th Cir. 1993)).

17  Here, the Zarazinski declaration provides no support for any suggestion that the named

18  defendants have a history of disobeying court orders, but rather states only that "cryptocurrency

19  thieves" will immediately attempt to move assets upon notice of legal proceedings.  (Doc. No. 2-2

20  at ¶ 39.)  The Zarazinski declaration simply does not provide support for plaintiff's contention

21  that those *accused* of stealing cryptocurrency will immediately attempt to transfer assets. *See Int'l*

22  *Mkts. Live, Inc. v. Huss*, No. 2:20-cv-00866-JAD-BNW, 2020 WL 2559926, at *2 (D. Nev. May

23  20, 2020) (holding that the plaintiff did not meet the "demanding burden" to obtain *ex parte* relief

24  where the plaintiff had not shown either that the defendant had a history of violating court orders

25  or that persons in a similar situation have a history of violating court orders).  Accordingly, the

26  court concludes that plaintiff has not met its burden of showing that defendants would violate a

27  court order and transfer assets if provided with the presumptively required notice.

28  /////

1    Plaintiff has not met its burden under Rule 65(b)(1)(b) of justifying the issuance of relief

2    on an *ex parte* basis based on the declarations it has submitted to the court.  The court will

3    therefore deny plaintiff's *ex parte* motion for a temporary restraining order without prejudice to it

4    renewing its motion upon providing notice to the adverse parties as required under Rule 65.

5    Nevertheless, for the sake of efficiency, the court will analyze below whether plaintiff has

6    sufficiently demonstrated a likelihood of irreparable harm that would justify the issuance of a

7    temporary restraining order.

8    **B.    Irreparable Harm**

9    The risk of irreparable harm must be "likely, not just possible." *All. for the Wild Rockies*,

10    632 F.3d at 1131.  "Speculative injury does not constitute irreparable injury sufficient to warrant

11    granting a preliminary injunction." *Caribbean Marine Servs. Co.*, 844 F.2d at 674.

12    Here, plaintiff argues that it has demonstrated a likelihood of irreparable harm because,

13    should defendants be given advance notice, defendants "will likely . . . move assets through

14    mixers, privacy protocols, or to unregulated exchanges in non-cooperative jurisdictions."  (Doc.

15    No. 2-1 at 18.)  It asserts that such moves would likely make it impossible to compel return of the

16    assets that are the subject of this action.  (*Id.*)  Based upon the Zarazinski declaration, plaintiff

17    further asserts that defendants resumed stolen asset transfers on January 20, 2025, creating a risk

18    of imminent asset dissipation.  (*Id.*; Doc. No. 2-2 at ¶ 33.)

19    "The propriety of a TRO hinges on a significant threat of irreparable injury that must be

20    imminent in nature." *Farmers Ins. Exch. v. Steele Ins. Agency*, No. 2:13-cv-00784-MCE-DAD,

21    2013 WL 1819988, at *1 (E.D. Cal. Apr. 30, 2013) (citing *Caribbean Marine Servs. Co.*, 844

22    F.2d at 674)); *see also Yamout v. Scapa*, No. 24-cv-08876-SVW-PD, 2024 WL 5185324, at *3–4

23    (C.D. Cal. Oct. 22, 2024) (finding that an unexplained delay of ten months in filing a motion

24    seeking a temporary restraining order weighed against a finding of irreparable harm) (citing

25    *Oakland Trib., Inc. v. Chron. Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985)).  Notable here is

26    that neither plaintiff, nor its assignor of rights Nakamoto, sought a temporary restraining order

27    until January 27, 2025, despite discovery of the alleged cyberattacks on July 3, 2024.  (Doc. No.

28    2-1 at 9.)  Seemingly addressing the issue of plaintiff's delay, Mr. Zarazinski declares that on

15

1   January 20, 2025, two of the Destination Addresses began transferring assets after a period of

2   inactivity that began in July 2024.  (Doc. No. 2-2 at ¶ 33); *see Stephens v. Doe*, No. 23-cv-04183-

3   JD, 2023 WL 5988592, at *1 (N.D. Cal. Sept. 13, 2023) (finding that, when the plaintiff had

4   waited more than 90 days to request a temporary restraining order and offered no evidence that

5   the targeted assets were being transferred, there was no pressing need for a TRO).  The Zarazinski

6   declaration also states that consolidation of assets into certain digital wallets for extended periods

7   followed by sudden transfers is common in cryptocurrency fraud cases, which heightens the risk

8   of imminent dissipation of funds.  (Doc. No. 2-2 at ¶ 38.)   Based on this opinion, plaintiffs argue

9   that the risk of further asset dissipation is imminent due to the typical behavior of cryptocurrency

10  thieves.  (Doc. No. 2-1 at 18.)

11       This court has previously recognized that under certain circumstances the risk of

12  irreparable harm is heightened in the context of fraudulent transfers of cryptocurrency due to the

13  risk of asset dissipation.  *See Jacobo v. Doe*, No. 1:22-cv-00672-DAD-BAK, 2022 WL 2052637,

14  at *5 (E.D. Cal. June 7, 2022); *Gaponyuk v. Alferov*, No. 2:23-cv-01317-KJM-JDP, 2023 WL

15  4670043, at *3 (E.D. Cal. July 20, 2023) (noting that cryptocurrency transactions can be

16  untraceable and anonymous creating risks of asset dissipation); *see also Yogaratnam v. Dubois*,

17  No. 24-cv-00393-NJB, 2024 WL 758387, at *4 (E.D. La. Feb. 23, 2024) (finding that the plaintiff

18  in that case had made a showing of irreparable harm because the defendants could transfer

19  allegedly stolen assets to inaccessible digital wallets at any moment).

20       However, other district courts have concluded that the issuance of a temporary restraining

21  order is generally inappropriate in cases involving the alleged theft of cryptocurrency where

22  monetary damages were available and would suffice.  *See Newton AC/DC Fund L.P. v. Hector

23  DAO*, No. 24-cv-00722-RK-JBD, 2024 WL 580182, at *3–4 (D.N.J. Feb. 13, 2024) (holding that,

24  where the plaintiff did not make a showing that the defendants were likely unable to pay an award

25  of money damages, the plaintiff had not shown irreparable injury justifying injunctive relief); *see

26  also Schiermeyer ex rel. Blockchain Game Partners, Inc. v. Thurston*, 697 F. Supp. 3d 1265,

27  1272–73 (D. Utah 2023) (finding that, because cryptocurrency tokens are "fungible and easy to

28  value," the plaintiff had failed to make an adequate showing of imminent irreparable harm

16

because he had not demonstrated that the defendant would be unable to pay an award of monetary damages); *MacDonald v. Dynamic Ledger Sols., Inc.*, No. 17-cv-07095-RS, 2017 WL 6513439, at *3 (N.D. Cal. Dec. 20, 2017) (finding that the plaintiff had not shown an immediate risk of irreparable harm where it was unclear that damages would be inadequate to compensate the plaintiff).  In making the determination of whether monetary damages are actually available and therefore would provide sufficient relief in cryptocurrency fraud cases, courts have looked to factors such as whether the defendants' identities are known, whether the fraudulent scheme is ongoing, and the defendants' conduct in the litigation.  *See Blum v. Tara*, No. 3:23-cv-24734-MCR-HTC, 2024 WL 5317287, at *4 (N.D. Fla. Feb. 5, 2024) (collecting cases in the context of a permanent injunction and finding irreparable injury was demonstrated where the defendants had defaulted and appeared to intend to continue a fraudulent scheme); *Bullock v. Doe*, No. 23-cv-03041-CJW-KEM, 2023 WL 9503380, at *5 (N.D. Iowa Nov. 3, 2023) (finding that where the identity of the defendants was unknown and the cryptocurrency assets could be quickly transferred that plaintiff had demonstrated irreparable injury).

Based on their delay in filing this action and the pending motion for emergency relief as well as their failure to show that monetary damages are likely to be unavailable or otherwise insufficient, the court believes plaintiff has not at this time met its burden of demonstrating a likelihood of irreparable harm absent the granting of the requested relief.  In the present case, plaintiff's Zarazinski declaration indicates that the Bittensor cyberattacks began seven months prior to the filing of plaintiff's request for a temporary restraining order and six months prior to the discovery by Opentensor of the Bittensor attacks, though it does not state when the assets stolen in the attacks were traced to the Destination Addresses.  (Doc. No. 2-2 at ¶¶ 13, 17.)  Mr. Zarazinski also declares that after the Bittensor attacks, the attackers transferred assets to the Destination Addresses, but he does not state when those transfers occurred other than the transfers received by two specific Destination Addresses on July 3, 2024.  (*Id.* at ¶ 33.)  Though plaintiff's investigation has apparently revealed that some assets of unknown origin were transferred on January 20, 2025, this is not an adequate basis upon which to find a risk of "imminent" injury based on the comparatively small volume of asset transfers to the amount allegedly taken in the

Bittensor attacks and the months-long delay in seeking emergency relief. *See Stephens*, 2023 WL 5988592, at *1 (holding that the plaintiff had not demonstrated imminent irreparable injury where 95 percent of the assets at issue were sitting undisturbed in digital wallets for 90 days). Plaintiff has also failed to allege that the named defendants would be unable to pay an award of monetary damages should it prevail in this case. *See Schiermeyer*, 697 F. Supp. 3d at 1273 (holding that, because the stolen cryptocurrency was fungible, the plaintiff must demonstrate that the defendant was likely to be unable to pay an award of monetary damages to demonstrate a likelihood of irreparable harm); *Bandyopadhyay v. Defendant 1*, No. 22-cv-22907-BB, 2023 WL 2263552, at *5–7 (S.D. Fla. Feb. 28, 2023) (holding, in a cryptocurrency fraud context, that the plaintiff had not shown irreparable injury where the plaintiff had not shown monetary damages would not compensate him for his loss); *see also Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 851–52 (9th Cir. 2009) ("Typically, monetary harm does not constitute irreparable harm. . . . [E]conomic damages are not traditionally considered irreparable because the *injury can later be remedied by a damage award*.") (emphasis in original), *vacated on other grounds by Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 565 U.S. 606 (2012).

Other factors relied upon by courts as weighing in favor of granting injunctive relief in somewhat similar cases are also absent here. Though the risks of asset dissipation in the cryptocurrency context may be heightened, particularly when a "plaintiff has been unable to identify the people behind the alleged scheme," plaintiff in this case has identified and named three defendants. *Bullock*, 2023 WL 9503380, at *5 (finding that the likelihood the defendants would move cryptocurrency assets out of the plaintiff's reach was heightened where the defendants' identities were unknown). Unlike in a previous case before the undersigned, there is no indication here that defendants have begun liquidating cryptocurrency assets. *See Jacobo*, 2022 WL 2052637, at *1–2 (describing the plaintiff's allegations that the unidentified defendant may have begun liquidating assets); *see also Leidel v. Project Invs., Inc.*, No. 9:16-cv-80060-KAM, 2021 WL 4991325, at *2 (S.D. Fla. May 28, 2021) (finding that the plaintiff had shown the likelihood of irreparable injury where the defendant had begun to liquidate stolen assets). Because the identity of at least some defendants are known and the assets at issue have remained

1    static for an extended period, it would appear that plaintiff must make some showing that those

2    defendants are likely to be unable to pay an award of damages were plaintiff to prevail in this

3    action.  *See Newton AC/DC Fund L.P.*, 2024 WL 580182, at *3 (finding that the plaintiff had not

4    shown irreparable injury when it had not shown that the identified defendants would be unable to

5    pay an award of damages).

6           Finally, even if plaintiff had met its burden of demonstrating irreparable harm, the court

7    must ensure that the injunctive relief sought is targeted at preventing the irreparable injury

8    present, specifically the dissipation of assets that its assignor owns.  *See, e.g., Stephens*, 2023 WL

9    5988592, at *2 (denying a request for a temporary restraining order where the plaintiff did not

10    demonstrate that the listed accounts contained only assets that he purportedly owned); *Huntley v.*

11    *VBit Techs. Corp.*, No. 22-cv-01164-CFC-SRF, 2023 WL 5938665, at *4–5 (D. Del. Aug. 10,

12    2023) (finding that, where the evidence showed that certain wallets held assets owned by

13    numerous individuals, the plaintiff was required to show that the extraordinary remedy of

14    imposing a prejudgment freeze on those wallets was necessary in order to prevent irreparable

15    harm), *report and recommendation adopted*, No. 22-cv-01164-CFC-SRF, 2023 WL 5932946 (D.

16    Del. Sept. 12, 2023).  Here, plaintiff contends that the tokens valued at $13,000,000 it alleges

17    were stolen from its assignor were taken during the June 1 cyberattack.  (Doc. No. 2-1 at 9.)

18    Plaintiff also provides a list of the Destination Addresses of the assets taken in that attack.  (Doc.

19    Nos. 1 at ¶ 54; 2-2 at ¶ 18.)  However, plaintiff has not presented any evidence that those

20    Destination Addresses contain only assets which were stolen from its assignor in the June 1

21    attack.  Indeed, the Zarazinski declaration indicates that some of the assets taken during that

22    cyberattack were put into the Binance exchange, which uses an omnibus account system that

23    pools funds from multiple users into shared wallets.  (Doc. No. 2-2 at ¶¶ 18, 36.)  Freezing of the

24    assets contained in the Destination Addresses associated with such a system would clearly appear

25    to impact nonparties to this litigation, since nonparties may well have had their assets pooled into

26    the same digital wallets as the assets at issue in this case.  *See Huntley*, 2023 WL 5938665, at *5

27    (denying the request for the extraordinary remedy of freezing assets where the plaintiffs did not

28    show that the assets being frozen were controlled by the defendants).  Therefore, the court

1  concludes that plaintiff has not met its burden of showing that the emergency relief it seeks is

2  appropriate to prevent the harm that plaintiff contends it will suffer.  *See, e.g., Montes v. U.S.*

3  *Bank N.A.*, 10-cv-00022-PSG-JC, 2010 WL 11597574, at *2 (C.D. Cal. Jan. 12, 2010) (denying a

4  request for temporary restraining order on the basis that the plaintiff failed to meet its burden to

5  show a likelihood of irreparable injury); *Vigneron Partners, LLC v. Woop Woop Wines Pty Ltd.*,

6  No. 06-cv-00527-JF, 2006 WL 8460096 (N.D. Cal. Mar. 31, 2006) (same).

7        If plaintiff were to renew its motion for a temporary restraining order after providing the

8  required notice, it is directed to also address the deficiencies noted in this order with respect to its

9  showing of irreparable harm.

10  **C.    Expedited Discovery[8]**

11        Plaintiff also seeks to expedite discovery to attempt to identify unknown defendants.

12  (Doc. No. 2-1 at 21.)  To that end, plaintiff argues that it has demonstrated good cause to seek the

13  identity of these unknown defendants based on its pending request for a temporary restraining

14  order and the narrow tailoring of its proposed discovery request.  (*Id.* at 22.)  Plaintiff contends it

15  can discover these identities through third-party subpoenas directed to the cryptocurrency

16  exchanges Coinbase, Binance, Whitebit, eXch, Kucoin, HTX, MexC, Elolix, Kraken, and OKX

17  (collectively "the Exchanges").  (*Id.* at 23.)  In particular, plaintiff seeks to obtain:

18
19        [C]urrently unavailable transaction histories from May 1, 2024
          (approximately 1 month before the attack) until the present,
20        including (1) records of deposits and withdrawals; (2) records of
          transfers to/from identified wallet addresses; (3) information about
          source and destination of funds; and (4) records of currency
21        conversions or swaps.

22        With respect to the identity of unknown defendants, Plaintiff intends
          to seek narrowly tailored information including (1) account opening
23        and closing documents; (2) Know Your Customer (KYC) and Anti-
          Money Laundering (AML) verification materials; (3) government-
24        issued identification documents; (4) proof of address documentation;
          and (5) information about beneficial owners and authorized users.

25

26  [8]  The undersigned is addressing plaintiff's motion for expedited discovery in this order because
    of its inclusion with the *ex parte* application for a temporary restraining order.  However, the
27  undersigned notes that any future motions pertaining to discovery, including those related to
    expedited discovery, are to be properly noticed before the assigned magistrate judge in
28  accordance with Local Rule 302(c)(1).  L.R. 302.

1  (*Id.* at 23–24.)

2      "In the Ninth Circuit, courts use the 'good cause' standard to determine whether discovery

3  should be allowed to proceed prior to a Rule 26(f) conference." *Rovio Ent. Ltd.*, 907 F. Supp. 2d

4  at 1099.  As noted above, "[i]n considering whether good cause exists, factors courts may

5  consider include:  (1) whether a preliminary injunction is pending; (2) the breadth of the

6  discovery request; (3) the purpose for requesting the expedited discovery; (4) the burden on the

7  defendants to comply with the requests; and (5) how far in advance of the typical discovery

8  process the request was made." *Id.* (citing *Am. LegalNet, Inc. v. Davis*, 673 F. Supp. 2d 1063,

9  1067 (C.D. Cal. 2009)).

10     In this case, plaintiff has diligently sought out the identities of the unknown defendant(s)

11  by employing a cryptocurrency investigator to identify the accounts to which its assignor's assets

12  were transferred.  (Doc. No. 2-2 at ¶¶ 2–4) (describing the qualifications of plaintiff's

13  investigator); *see Lee v. Does #1-3*, No. 2:23-cv-02008, 2024 WL 472375, at *1 (W.D. Wash.

14  Jan. 10, 2024) (holding that the plaintiff had shown good cause for expedited discovery as to the

15  identity of the unknown defendants where diligence was shown by the hiring of a cryptocurrency

16  investigator).  As discussed above, plaintiff has recounted in its motion and attached declarations

17  the steps it has taken to trace the destinations and the specific wallet addresses the allegedly

18  stolen assets are currently in.  "Courts routinely allow early discovery for the limited purpose of

19  identifying defendants on whom process could not otherwise be served, which is precisely

20  Plaintiff['s] intent here." *Amazon.com, Inc. v. Does 1-20*, No. 2:24-cv-01083-TL, 2024 WL

21  4893384, at *2 (W.D. Wash. Nov. 26, 2024) (internal quotation marks omitted) (quoting

22  *Amazon.com, Inc. v. Dafang Haojiafu Hotpot Store*, No. 2:21-cv-00766-RSM, 2022 WL

23  2511742, at *2 (W.D. Wash. June 8, 2022)).  Accordingly, the court will grant plaintiff's request

24  for expedited discovery directed to the above-listed cryptocurrency exchanges solely for the

25  purpose of obtaining identifying information about the unknown defendant(s).  Upon service of a

26  Rule 45 subpoena to the Exchanges, defendants or the Exchanges will have an opportunity to

27  raise objections through a motion to quash in which they could attempt to demonstrate to the

28  court that prejudice to them outweighs plaintiff's need for the information sought.

However, the court does not find that plaintiff has narrowly tailored all of its proposed discovery requests to the cryptocurrency exchanges or provided good cause for the authorizing of expedited discovery beyond specific identifying information about the Doe defendant.  In particular, plaintiff's proposed discovery requests for documents and information regarding transactions involving the Destination Addresses and communication with defendant and any non-party accountholder of the Destination Addresses appears to "seek affirmative relief from this [c]ourt that is the subject of this lawsuit, and go[es] well beyond the request for expedited discovery."  *See ZG TOP Tech. Co.*, 2019 WL 917418, at *3.  Other district courts in this circuit have declined to broaden the scope of expedited discovery to transaction information, even when a plaintiff contends, as plaintiff does here, that it needs this information to prevent asset dissipation.  *See Lee*, 2024 WL 472375, at *2 (finding that the potential harms to the defendants of exposing sensitive account information outweighed the risk of loss to the plaintiff); *Kovalenko v. Does 1-5*, No. 2:22-cv-01578-TL, 2022 WL 17582483, at *3 (W.D. Wash. Dec. 12, 2022) (authorizing expedited discovery for the limited purpose of identifying the defendants but not as to discovery of cryptocurrency wallet addresses and transaction numbers).

Accordingly, the court will deny authorization of discovery requests not targeted at the identities of the unknown defendants on an expedited basis.

## CONCLUSION

For the reasons explained above, plaintiff's motion for a temporary restraining order is denied and plaintiff's motion for expedited discovery is granted in part (Doc. No. 2) as follows:

1.    Plaintiff's motion for a temporary restraining order is denied without prejudice to refiling with proper notice;

2.    Plaintiff's motion for expedited discovery is granted in part as follows:

a.    Plaintiff may immediately serve a Rule 45 subpoena on the Exchanges seeking the following information about the owners and authorized users of the Destination Addresses (the unknown defendant(s)):  legal name, street address, telephone number, and email address.  It may not include defendants' social security numbers.  A copy of this order shall be attached

1        to the subpoena;

2                    i.       If a cryptocurrency exchange is served with a subpoena authorized by this order, it shall serve a copy of the subpoena and a copy of this order to the defendant and any other affected user as soon as possible after service of the subpoena. The cryptocurrency exchange may serve the user using any reasonable means, including written notice sent to the user's last known address, transmitted either by first-class mail or via overnight service. The cryptocurrency exchange shall provide plaintiff with the date when such notice was provided to any affected user;

ii.      The cryptocurrency exchanges and any affected user shall have fourteen (14) days from the respective date of service of the subpoena upon them to object to the subpoena pursuant to Federal Rule of Civil Procedure 45(d)(2)(B);

iii.     The cryptocurrency exchanges shall not disclose the identifying information of the owners and authorized users of the Destination Addresses, or such information for any other affected user, during the 14-day period or if a timely objection is served unless and until the Court orders it to do so;

iv.     If an objection is served, the cryptocurrency exchanges shall preserve any material responsive to the subpoena for a period of no less than ninety (90) days in order to allow plaintiff to move for an order compelling production under Federal Rule of Civil Procedure 45(d)(2)(B)(i); and

v.      If no objection is served, the cryptocurrency exchanges shall comply with the subpoena within twenty-one (21) days of service;

/////

/////

b.     Plaintiff's motion for expedited discovery (Doc. No. 2) is denied as to all its other proposed discovery requests.

IT IS SO ORDERED.

Dated:   **February 7, 2025**                       

DALE A. DROZD
UNITED STATES DISTRICT JUDGE