UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUSTM2J LLC,<br><br>Plaintiff,<br><br>v.<br><br>AYDEN BREWER, JON LITZ, JASON ST. GEORGE, and JOHN DOE 1, et al.,<br><br>Defendants. | No. 2:25-cv-0380-DAD-SCR<br><br>ORDER |

Before the court is a motion by Defendants Ayden Brewer, Jon Litz, and Jason St. George to stay discovery pending the District Judge's decision on their motions to dismiss (ECF Nos. 15-16) the First Amended Complaint ("FAC"), or, alternatively, to limit discovery to the identification of any Doe defendants. ECF Nos. 39, 44. For the reasons provided below, the Court largely denies the motion, but stays jurisdictional discovery.

## I. INTRODUCTION

**A. Operative Complaint**

The FAC explains that the Opentensor Foundation ("Opentensor") is the owner and developer of the Bittensor network ("Bittensor"), an open-source platform AI researchers can use to develop and improve each other's digital commodities. ECF No. 14 at ¶ 21. Users are paid for meaningful computations or machine-learning in TAO, digital tokens worth hundreds of dollars

1  each and stored in a cryptocurrency wallet. *Id.* at ¶¶ 22-23. Opentensor uses PyPI, a password
2  protected service, to upload and distribute Bittensor updates to users. *Id.* at ¶ 4. The FAC's
3  allegations concern a "Bittensor Attack" involving the digital theft and concealment of 61,793.90
4  TAO—worth about $30.3 million as of February 28, 2025—across 32 Bittensor wallets from May
5  22 to July 2, 2024. *Id.* at ¶ 2.

6  California resident Brewer and New York resident St. George were Bittensor developers
7  until early 2024, using the screennames "Rusty" and "Philanthrope," respectively. *Id.* at ¶¶ 12-
8  13. They also owned and operated Vertex Storage Solutions, LLC ("Vertex"), headquartered in
9  Sacramento, California. *Id.* at ¶¶ 12-13, 43. They incorporated Vertex in December 2023 to
10 serve as owner of the "FileTAO" Bittensor subnet. *Id.* at ¶¶ 12-13, 42. Litz, a Missouri resident
11 whose online handle is "0xJones," unsuccessfully applied to be a Bittensor developer in January
12 2024, after which he operated FileTAO with Brewer and St. George. *Id.* at ¶ 14.

13 Before leaving Opentensor, St. George was the developer who designed Bittensor's
14 software code. *Id.* at ¶ 34. He was also one of only six people who had Opentensor's API key.[1]
15 *Id.* at ¶ 27. Before leaving Opentensor, Brewer previewed several elements of what would
16 become the Bittensor Attack to other Opentensor employees. *Id.* at ¶ 39. This included
17 transferring cryptocurrency without being detected, using "privacy coin" like Monero to conceal
18 proceeds, and registering accounts on exchanges that do not require using the owner's legal name.
19 *Id.* at ¶ 39. As of the Bittensor Attack, Litz was a member of a Telegram channel related to
20 Railgun, a service enabling users to obscure cryptocurrency transaction information. *Id.* at ¶ 40.

21 On May 20, 2024, Defendants registered the domain name opentensor.io, specifically to
22 mimic Opentensor's domain. *Id.* at ¶ 46. On May 22, 2024, Opentensor released a Bittensor
23 update, "version 6.12.2," onto Github. *Id.* at ¶ 47. Moments later, Defendants illicitly used
24 Opentensor's PyPI key to upload their own file named "version 6.12.2" to PyPI ("Attack
25 Software"), blocking the upload of the legitimate version 6.12.2 update. *Id.* at ¶ 48. The Attack
26 Software was identical to the legitimate update on Github except that once the users made a

27
28  [1] "PyPI uses proprietary API tokens (or 'keys') to authenticate the source of each software package uploaded to PyPI." *Id.* at ¶ 26.

2

subsequent cryptocurrency transfer, the private key associated with the user's crypto wallet was transmitted to opentensor.io. *Id.* at ¶ 6, 48.

Also on May 22, 2024, FileTAO released an update requiring users to install "version 6.12.2" of Bittensor. *Id.* at ¶ 85. Requiring Bittensor users to install Bittensor updates immediately upon their release is itself unusual. *Id.* at ¶ 86. In any case, while those who downloaded the Bittensor update from Github were unaffected, those who used PyPI downloaded the Attack Software instead. *Id.* at ¶¶ 49-50. Between May 22 and July 2, when Opentensor discovered and removed the Attack Software from their PyPI account, Defendants used 32 different wallet keys to steal 61,793.90 TAO. *Id.* at ¶¶ 51-54.

Defendants attempted to launder the TAO via the tools and techniques Brewer had previewed to Opentensor employees. They exchanged TAO for other crypto assets before exchanging those assets for Monero. *Id.* at ¶ 57. They transferred assets to exchanges and private wallet addresses. *Id.* at ¶ 57. These wallets include Railgun and a private wallet that was used in at least one prior cryptocurrency theft and possibly a money laundering operation ("Suspected Laundering Service"). *Id.* at ¶ 57. Efforts to hide the stolen cryptocurrency has succeeded insofar as its current location is not completely known. *Id.* at ¶¶ 58-62.

Some evidence within the blockchain connects Defendants to the Bittensor Attack. For example, one of Litz's Ethereum wallets ("Subnet Wallets"), 0xD5, transferred assets to the Suspected Laundering Service between June 8 and July 16, 2024. *Id.* at ¶ 76. This transaction also used an intermediate address associate with the Bittensor Attack, 0x5E. *Id.* at ¶ 77.

In May 2024, before the attack, Defendants attempted to negotiate an expedited $3.5 million sale of FileTAO. *Id.* at ¶ 84. Defendants stopped communicating with the prospective purchaser on June 8, began transferring FileTAO's assets out of Bittensor on June 10, and deregistered FileTAO on Bittensor on June 11. *Id.* at ¶ 88. St. George and Litz deleted their online presence on Discord, Twitter, and other social media sites. *Id.* at ¶¶ 89-90. Vertex dissolved in September. *Id.* at ¶ 91.

Thirteen victims, representing 99% of the lost TAO, assigned all legal claims to Plaintiff after the Bittensor Attack. *Id.* at ¶ 93. Plaintiff is a Delaware entity with a principal place of

1  business in Florida, and a single member living in Texas. *Id.* at ¶ 11. Plaintiff alleges violations
2  of the Computer Fraud and Abuse Act ("CFAA") (*id.* at 20-21), the Wiretap Act (*id.* at 21-22),
3  and California Penal Code § 496 (*id.* at 24); fraud (*id.* at 22); conversion (*id.* at 22-23); unjust
4  enrichment (*id.* at 23); and constructive trust and disgorgement of funds (*Id.* at 23).

### B. Procedural History

Plaintiff filed this action on January 27, 2025, and the FAC on February 28. ECF Nos. 1, 14. On April 8, Brewer moved to dismiss the action for failure to state a claim. ECF No. 15. Litz and St. George also moved to dismiss the action for lack of personal jurisdiction and failure to state a claim. ECF No. 16-18. Both motions have been fully briefed and were submitted without oral argument. ECF Nos. 24-29, 33-35, 38.

On May 27, the parties submitted a joint status report pursuant to Rule 26(f) and Local Rule 240, noting Plaintiff's position that a discovery schedule should be set and Defendants' position that discovery should be stayed. ECF No. 36. In light of the joint status report and Defendant's pending motions to dismiss, the District Judge declined to issue a scheduling order that would have set discovery deadlines. ECF No. 37.

Defendant filed this motion to stay discovery on June 11, which the parties subsequently briefed pursuant to a joint statement. ECF Nos. 39, 44. Although Plaintiff has not served discovery requests on Defendants, Plaintiff has served subpoenas on Coinbase Global Inc. ("Coinbase") and Rusty's RV Rentals LLC ("Rusty's"). ECF Nos. 39-3, 39-4, 44 at 4. The subpoena served on Coinbase seeks records for eight cryptocurrency addresses that Plaintiff contends were "used by wallets" indirectly "connected" to Defendants. ECF No. 39-3 at 7, 10; ECF No. 44 at 4. Coinbase paused production of responsive documents pending the outcome of this motion. ECF No. 44 at 4. The subpoena served on Rusty's seeks all financial records, government agency filings, negotiable instruments, rental agreements, communications, cryptocurrency-related documents, and records of investments by St. George since May 1, 2024. ECF No. 39-4 at 7, 10-11. Rusty's objects to the subpoena and has refused to produce any information. ECF No. 44 at 3.

////

## II.     LEGAL STANDARDS

A district court exercises "wide discretion in controlling discovery." *Little v. City of Seattle*, 863 F.2d 681, 685 (9th Cir. 1988). It has similarly broad discretion to stay proceedings as an incident to its power to control its docket. *See Clinton v. Jones*, 520 U.S. 681, 706 (1997); *see also Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1109 (9th Cir. 2005) (court's power to stay proceedings is incidental to power to control cases with economy for itself, counsel, and litigants). The ordinary course of litigation is for discovery to proceed in the face of a pending dispositive motion. Courts disfavor blanket stays of discovery because "delaying or prolonging discovery can create unnecessary litigation expenses and case management problems." *Salazar v. Honest Tea, Inc.*, 2015 WL 6537813, at *1 (E.D. Cal. Oct. 28, 2015) (citation omitted). On the other hand, a stay of discovery pending the resolution a potentially dispositive motion may further the goal of efficiency for the courts and the litigants. *See, e.g., Little*, 863 F.2d at 685.

Courts in the Ninth Circuit typically rely heavily on two factors to determine if delaying discovery is appropriate: (1) whether the pending motion is potentially dispositive of the case, or at least would render unnecessary the discovery at issue; and (2) whether the pending motion can be decided absent additional discovery. *See Salazar*, 2015 WL 6537813, at *1. The first prong is not satisfied if disposition of the motion would likely involve leave to amend. *See, e.g., Mlejnecky v. Olympus Imaging Am., Inc.*, 2011 WL 489743, at *9 (E.D. Cal. Feb. 7, 2011) (finding a pending motion to dismiss not dispositive of the case where the Magistrate Judge anticipated that, even if the motion were granted, the District Judge would grant leave to amend). "In applying the two-factor test, the court deciding the motion to stay must take a 'preliminary peek' at the merits of the pending dispositive motion to assess whether a stay is warranted." *Yamasaki v. Zicam LLC*, 2021 WL 3675214, at *1 (N.D. Cal. Aug. 19, 2021) (citation omitted).

Courts both within and beyond the Ninth Circuit also regularly apply additional factors in deciding whether to stay discovery. These "*Skellerup* factors" include "[t]he type of motion and whether it is a challenge as a matter of law or the sufficiency of the allegations; the nature and complexity of the action; whether counterclaims and/or cross-claims have been interposed; whether some or all of the defendants join in the request for a stay; the posture or stage of the

5

litigation; the expected extent of the discovery in light of the number of parties and complexity of the issues in the case; and any other relevant circumstances." *Skellerup Industries Limited v. City of Los Angeles*, 163 F.R.D. 598, 601 (C.D. Cal. 1995) (citation and quotation omitted). In evaluating all of the relevant factors, courts foreground the need to balance the downside of delaying discovery against the possibility that the motion will be granted and eliminate the need for discovery. 2015 WL 6537813, at *1 (citations omitted).

### III.    ANALYSIS

Given that the parties have held their Rule 26(f) conference, ECF No. 36, discovery is now authorized, absent a stay or protective order. *See* Fed. R. Civ. P. 26(d)(1). As explained below, with the exception of jurisdictional discovery, the applicable factors as a whole weigh against staying discovery. Jurisdictional discovery should be stayed at this point given that Plaintiff specifically sought the opportunity to tailor any jurisdictional discovery request to an adverse ruling on the motion to dismiss by St. George and Litz. However, having taken a preliminary peek at the other aspects of the motions to dismiss, the undersigned believes those motions are not likely to dispose of the entire case. Even if Defendants prevail on the current motions, the Court is likely to grant Plaintiff leave to amend. Moreover, the motions are complex and do not involve case-dispositive issues likely to be resolved as a matter of law. Nor is there otherwise good cause to stay discovery.

### A. PLAINTIFF ANTICIPATES TAILORING ANY REQUEST FOR JURISDICTIONAL DISCOVERY TO THE DISTRICT JUDGE'S RULING

Plaintiff requested jurisdictional discovery in opposition to the motion to dismiss by St. George and Litz. ECF No. 26 at 18-19. However, Plaintiff noted that any "jurisdictional discovery request would necessarily be tied to the scope and basis of any determination by this Court that the jurisdictional showing set forth [in the opposition] and in the Complaint falls short[.]" *Id*. at 1 n.1. Plaintiff accordingly requested that it be permitted to "submit a more detailed jurisdictional discovery request" after the Court rules on the motions to dismiss. *Id*. at 19 & 1 n.1. By Plaintiff's own account, then, jurisdictional discovery should await Judge Drozd's

////

ruling on personal jurisdiction. All discovery concerning personal jurisdiction will be stayed absent further order of the Court.

The undersigned recognizes the possibility that certain merits discovery will be intertwined with jurisdictional discovery.[2] Such dual-purpose discovery may appropriately proceed. However, any purely jurisdictional discovery will await Judge Drozd's rulings and any jurisdictional discovery request Plaintiff might then make. Disputes about whether any discovery is dual purpose or purely jurisdictional may, after a meet and confer, be brought promptly before the undersigned through an informal discovery conference ("IDC").[3]

### B. MERITS OF THE MOTIONS TO DISMISS AND THE IMPLICATIONS FOR DISCOVERY

In ruling on the motion to stay, the undersigned must take a "preliminary peak" at the pending motions to dismiss in order to evaluate their scope and the likelihood that they will resolve the entire case. *See Mlejnecky,* 2011 WL 489743, at *8. "The undersigned recognizes the awkward nature of this review procedure here." *Id*. The "responsibility" for "resolv[ing] defendant's motion to dismiss plaintiff's First Amended Complaint belongs only to" Judge Drozd, and Judge Drozd "may take a different view of the merits." *Id*. Given that this is only a preliminary peek, the analysis below will not be as detailed or complete as it would be if the motions to dismiss were being fully adjudicated. With that caveat, the analysis proceeds.

The motions to dismiss collectively raise three types of arguments. Both motions argue the FAC generally fails to sufficiently plead specific facts as to Defendants' wrongdoing, particularly under the heightened pleading standard for fraud. ECF No. 15 at 17-22, 28, 30-33; ECF No. 16 at 26-31. Brewer also raises several arguments as to why specific claims fail as a matter of law or fact. ECF No. 15 at 22-28, 32-33. Litz and St. George argue that the FAC does

---

[2] As Plaintiff stated in its opposition: "Specific topics that may be appropriate for jurisdictional discovery include, but are not limited to: the alter ego relationships between Moving Defendants, Vertex and FileTAO; Moving Defendants' actual or constructive knowledge that Plaintiff's Assignors, FileTAO participants, or Python-based Bittensor participants more generally were located in California; and Defendant Litz's involvement in and control over FileTAO." ECF No. 26 at 19.

[3] The IDC process is described in Magistrate Judge Riordan's "Civil Standing Order."

not plead sufficient facts to demonstrate that this Court can assert personal jurisdiction over them. ECF No. 16 at 15-26.

That two motions to dismiss are pending in this action, and the motion for a stay hinges on both, reflects the complexity of this case. *See* ECF No. 44 at 2. This action concerns three Defendants, a Plaintiff representing thirteen alleged victims, and seven causes of action across federal and state law. Aside from this complexity itself disfavoring a stay (*see Skellerup*, 163 F.R.D. at 601), Defendants do not articulate whether certain discovery should be precluded by the prospect of success on particular aspects of their motions as opposed to others. At most, they concede that the Court "could order limited jurisdictional discovery" given St. George's and Litz's personal jurisdiction arguments "in the event the motion to stay is granted." ECF No. 44 at 9 (quoting *Spearman v. I Play, Inc.*, 2018 WL 1382349, at *2 (E.D. Cal. March 19, 2018)).[4] Upon a preliminary peek at the motions to dismiss, the Court will only bar discovery if it determines that the pleadings fail such that leave to amend would be futile.

### 1. Defendants' Attack on the FAC's Factual Allegations

Brewer argues in his motion to dismiss that the FAC fails to articulate specific and non-conclusory allegations about the role each Defendant played in an alleged conspiracy to steal TAO.[5] ECF No. 15 at 18-19. He argues that the FAC mostly refers to the "Defendants" or "attackers" as a group, yet fails to demonstrate an agreement between Defendants beyond their professional relationship through Vertex. *Id.* at 19. Brewer reinforces this argument by asserting that because all claims sound in fraud, a complaint must plead the circumstances constituting such fraud "with particularity." *Id.* at 18; Fed. R. Civ. P. 9(b).

If the FAC does not already plead such facts, it pleads sufficient facts to show that Plaintiff could likely amend it to address any deficiencies. Although it often refers to "the

---

[4] As noted in Section III.A, above, Plaintiff's request in opposition to the motions to dismiss—that any jurisdictional discovery be done only after resolution of the motion to dismiss—makes jurisdictional discovery unwarranted at this point.

[5] St. George and Litz also argue that the FAC fails to state a claim as to each of them under Rule 12(b)(6). ECF No. 16 at 27-32. St. George and Litz primarily reiterate Brewer's arguments, including that legitimate business reasons underlie some of the factual allegations. ECF No. 16 at 28, 30.

8

attackers" as a single unit, it also includes certain facts about each Defendant's alleged role in the Bittensor Attack. St. George, as one of only six people with Opentensor's API key, used it to upload the Attack Software disguised as a legitimate Bittensor update. ECF No. 14 at ¶¶ 27, 48. Brewer developed parts of the Bittensor Attack plan, from the initial virus to the concealment of funds through Monero and exchanges, which Defendants would execute together. *Id.* at ¶¶ 39, 57. Litz furthered this effort by helping launder the stolen TAO, both by using Railgun and linking his own Subnet Wallets to a Suspected Laundering Service. *Id.* at ¶¶ 40, 57, 76-77. These defendant-specific allegations were made against the backdrop of numerous other facts about the Bittensor Attack and its final result—the interception of wallet keys through the Attack Software and the theft of cryptocurrency therein. *Id.* at ¶¶ 49-54.

Brewer counters that many of the allegations supporting the accusation that Defendants orchestrated the Bittensor Attack are equally consistent with innocent activity. ECF No. 15 at 20. He cites *Twombly* to assert that showing "parallel conduct" is insufficient to demonstrate any agreement or conspiracy between Defendants. *Id.* (citing *Bell Atlantic v. Twombly*, 550 U.S. 544, 553-54 (2007)). While parallel conduct standing alone would be insufficient to plausibly allege wrongful conduct, Plaintiff appears to allege more than merely parallel conduct. *See supra*, Section I.A. "[W]hen the entire sequence of events in the complaint is considered in context, what might otherwise appear to have been coincidental parallel conduct on its own becomes 'suggestive of illegal conduct' and is thus sufficient to survive a motion to dismiss." *Soo Park v. Thompson*, 851 F.3d 910, 928–29 (9th Cir. 2017) (quoting *Twombly*, 550 U.S. at 564 n.8). Moreover, pleadings need not refute other, potentially innocent explanations for alleged wrongful acts to be deemed plausible at the motion to dismiss stage—otherwise the requirement that reasonable inferences be drawn in a plaintiff's favor would be a dead letter. *See Boquist v. Courtney*, 32 F.4th 764 (9th Cir. 2024) (reversing and remanding in part because of district court's failure to draw all reasonable inferences in the plaintiff's favor).

Based on a preliminary peek, it is not clear that the FAC's allegations are generally deficient. But even if they are generally deficient, leave to amend would likely be granted to allow Plaintiff to attempt to plead additional facts.

### 2. Brewer's Challenges to Specific Claims

After general arguments regarding the sufficiency of the pleadings, Brewer raises questions of both law and fact to challenge individual causes of action. Questions of law include whether Bittensor Attack victims could assign their rights to sue under the CFAA and Wiretapping Act (ECF No. 15 at 22-23, 27), to what extent an assignee can sue for punitive damages under the California Penal Code (*id.* at 34), whether cryptocurrency like TAO is a cognizable loss under the CFAA (*id.* at 23-25), whether the victims' electronic wallets constituted "protected computers" under the CFAA (*id.* at 26-27), whether the Attack Software constituted a "device" under the Wiretapping Act (*id.* at 29), and whether the remedy of constructive trust can provide basis for a separate cause of action (*id.* at 33). By Brewer's own admission, some of these issues have not been definitively settled in Defendants' favor. *See id.* at 29. Even if Brewer were to succeed on all of these purely legal arguments, the case would proceed because it is premised on both diversity jurisdiction and federal question jurisdiction. ECF No. 14 at ¶¶ 16-17.

The remaining arguments concern the sufficiency of pleadings as to specific claims. As to the claim for fraud, for example, Brewer argues that the FAC does not allege he made any knowingly false representation with the intent to defraud, or that Plaintiff sustained damages for reasonably relying on such representations. ECF No. 15 at 31 (citing *Herrejon v. Ocwen Loan Servicing, LLC*, 980 F.Supp.2d 1186, 1202 (E.D. Cal. 2013)). The FAC alleges that the named Defendants, as FileTAO operators, induced Bittensor users to download the Attack Software by disguising it as a Bittensor update purportedly needed to run FileTAO. ECF No. 14 at ¶¶ 12-14, 42, 48-50, 85-86. This allowed Defendants to allegedly use the Attack Software to steal wallet keys and subsequently drain these wallets of all TAO. *Id.* at ¶¶ 51-54. If this does not currently satisfy the pleading requirements for fraud, it at least suggests Plaintiff could amend the pleadings to adequately address any deficiencies as to Defendants' mental states.

Brewer then argues that the conversion and unjust enrichment claims should be dismissed because even after a forensic blockchain investigation, none of the stolen funds have been traced to any named Defendant. ECF No. 15 at 31-32. He cites *Oakdale Village Group v. Fong*'s holding that a plaintiff alleging conversion must "show an assumption of control or ownership

over the property, or that the alleged converter has applied the property to his own use." *Id.* (citing 43 Cal.App.4th 539, 543–44 (Cal. Ct. App. 1996)). The plaintiff in *Oakdale* had appealed a final judgement in the defendant's favor following a motion for a new trial. 43 Cal.App.4th at 543. Whether a complaint must plead knowledge of where a defendant has hidden stolen assets to survive a motion to dismiss the claim is therefore unclear. In any case, as Plaintiff argues, the allegation that the Attack Software gave Defendants the wallet keys needed to control the victim's TAO may constitute an "assumption of control." ECF No. 24 at 29 (citing *Shin v. ICON Found.*, 2021 WL 1893117, at *9 n.3 (N.D. Cal. May 11, 2021)).

A preliminary peek at Brewer's arguments concerning specific causes of actions does not clearly show that those arguments are likely to succeed. Alternatively, it is not likely that leave to amend them to cure any deficiencies would be futile.

### 3. Conclusion

A preliminary peek at the motions to dismiss does not suggest that the arguments therein, individually or collectively, would be dispositive of this case without additional discovery. "Generally, there must be *no question* in the court's mind that the dispositive motion will prevail, and, therefore, discovery is a waste of effort." *Flynn v. Nevada*, 345 F.R.D. 338, 346 (D. Nev. 2024) (emphasis in original). The predominant two-factor test does not support granting a stay.

### C. *SKELLERUP* FACTORS AND THE BURDEN OF DISCOVERY

The *Skellerup* factors also do not favor staying discovery.[6] Several of these factors are self-evident as applied to the relevant circumstances. As discussed above, the motions to dismiss are based on *both* questions of law and of fact. *See supra* III.B.2. The case is complex insofar as it involves three Defendants, a Plaintiff representing thirteen alleged victims, and seven causes of action based in both federal and state law. *See supra* III.B. Both of these factors then weigh against a stay. However, all three Defendants have moved for this stay, and none of them have

---

[6] Again, those factors are: "The type of motion and whether it is a challenge as a matter of law or the sufficiency of the allegations; the nature and complexity of the action; whether counterclaims and/or cross-claims have been interposed; whether some or all of the defendants join in the request for a stay; the posture or stage of the litigation; the expected extent of the discovery in light of the number of parties and complexity of the issues in the case; and any other relevant circumstances." 163 F.R.D. at 601.

1　filed counterclaims. Plaintiff also cites authority that when a case "is in its early phases and
2　progression has been typical," as here, the procedural posture does not merit a stay. ECF No. 44
3　at 21 (citing *Elliot v. Conagra Brands, Inc.*, 2024 WL 1676632, at *2 (E.D. Cal. Apr. 17, 2024)).
4　The most disputed issues are the anticipated extent of discovery and the prejudice that would
5　occur from staying it.

6　　　　Defendants cite *United States v. Dynamic Medical Systems, LLC* and *United States ex rel*
7　*Modglin v. DJO Global Inc.* to argue that the interest in avoiding unnecessary discovery is
8　heightened when, as here, all claims sound in fraud and are subject to a heightened pleading
9　standard. *See supra* III.B.1; ECF No. 44 at 10 (citing 2020 WL 3035219, at *5 (E.D. Cal. June 5,
10　2020); 2014 WL 12564275, at *2-3 (C.D. Cal. Feb. 20, 2014)). Neither case squarely applies
11　here. *Mogdlin* concerned the specific context of False Claims Act ("FCA") actions, which by
12　definition involve "insiders privy to a fraud on the government" who as "insiders should have
13　adequate knowledge of the wrongdoing at issue" to "be able to comply with Rule 9(b)." 2014
14　WL 12564275, at *2 (quoting *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001)). As
15　*Modglin* noted, under the FCA, "courts have repeatedly refused to allow qui tam relators to rely
16　on later discovery to comply with Rule 9(b)'s pleading requirements[.]" *Id*. (quoting *United*
17　*States ex rel. Karvelas v. Melrose-Wakefield Hospital*, 360 F.3d 220, 231 (1st Cir. 2004)). "For
18　these reasons, California district courts have found that it is proper in FCA cases where a motion
19　to dismiss for failure to plead fraud with particularity is pending to stay discovery until the court
20　has had the opportunity to decide whether the complaint satisfies the heightened pleading
21　requirements of Rule 9(b)." *Id*. The logic of *Modglin*, turning as it does on the special insider
22　knowledge qui tam relators are expected to have from the outset, does not extend to a case like
23　this where the alleged fraud involved labyrinthine software.[7]

24　　　　Nor does *Dynamic Medical Systems* suggest a special rule regarding stays of discovery
25　whenever Rule 9(b) might apply. Rather, the judge in that case simply "decline[d] to potentially

---

27　[7] Moreover, contrary to this case, the plaintiffs in *Modglin* did not "argue that defendants are not
　　likely to succeed on their motion to dismiss because plaintiffs have pled their allegations with
28　sufficient specificity under Rule 9(b)." 2014 WL 12564275, at *3.

1 weigh into the merits of the motions to dismiss that are ripe for adjudication and pending before
2 the District Judge assigned to this action[.]" 2020 WL 3035219, at *2.  To the extent that
3 *Dynamic Medical Systems*—a California False Claims Act case—relied on *Modglin*, *id*. at *5, it
4 would be distinguishable for the same reasons provided directly above.

5       Defendants then argue that because the District Judge vacated the scheduling conference
6 pending resolution of this motion, Plaintiff cannot be prejudiced in the absence of a scheduling
7 order with a discovery deadline.  ECF No. 44 at 11 (citing ECF No. 37; *Stavrianoudakis v. United*
8 *States Dep't of Fish & Wildlife*, 2019 WL 9667685, at *3 (E.D. Cal. Dec. 20, 2019)).  While this
9 is true, the court in *Stavrianoudakis* weighed this against the "unnecessary motion practice,
10 litigation costs, and a waste of judicial resources" that would occur without a stay.  2019 WL
11 9667685, at *3.  The question becomes what discovery Plaintiff seeks to propound before the
12 District Judge may rule on the motions to dismiss.

13       Defendant argues that the discovery propounded on third-parties thus far demonstrates
14 that the anticipated discovery would be burdensome and invasive.  ECF No. 44 at 12.  After St.
15 George disclosed investments in real estate property used by an RV business, Plaintiff
16 subpoenaed Rusty's, an RV business owned by Brewer's father.  *Id.* (citing ECF Nos. 16-1 at ¶ 4,
17 39-4).  This subpoena seeks a variety of records since May 2024, despite Rusty's apparently
18 having no direct connection to this case.  ECF No. 39-4 at 7, 10-11; ECF No. 44 at 12.  Similarly,
19 Plaintiff has subpoenaed Coinbase for information about eight cryptocurrency addresses, despite
20 Brewer stipulating that one of them is his.  ECF No. 39-3; ECF No. 44 at 13.  Defendants
21 categorize these subpoenas as "egregious example[s] of a fishing expedition and harassment".
22 ECF No. 44 at 14.  They therefore request, at minimum, that discovery be limited to accounts,
23 addresses, or businesses with no connection to currently named Defendants.  *Id.*

24       Plaintiff argues that Defendants do not have "standing to quash a subpoena served upon a
25 third party."  ECF No. 44 at 15 (quoting *California Sportfishing Prot. All. v. Chico Scrap Metal,*
26 *Inc.*, 299 F.R.D. 638, 643 (E.D. Cal. 2014)).  While only the responding third-party can move to
27 quash or for a protective order, this does not mean that their burden is irrelevant.  While the
28 undersigned has some concerns, based on the current record, about the subpoena to Rusty's, those

1  concerns are not sufficient to show that discovery generally should not proceed.

2  Plaintiff also argues that courts do not recognize the costs of responding to discovery as a "sufficiently particularized or unique harm to support a discovery stay where it would not otherwise be warranted." ECF No. 44 at 21 (*Elliot*, 2024 WL 1676632, at *2). Defendants, however, do not just assert financial costs. They emphasize the pattern of fishing, purportedly harassment, that Plaintiff engages in through third-party subpoenas. ECF No. 44 at 14. This may constitute a more particularized form of harm than comprehensive discovery requests otherwise entail.

Defendants' argument ultimately fails, however, because of the context in which Plaintiff propounded subpoenas for the information at issue. Brewer's motion to dismiss alleges that the FAC's failure to articulate what Defendants did with the stolen TAO is fatal to some of the claims. *See supra* III.B.2; ECF No. 15 at 31-32. Discovery regarding any businesses with a connection to named Defendants is therefore relevant, at a minimum for determining whether any investments are tied to the missing cryptocurrency. Defendants' alternate proposal, allowing discovery into any company with no connection to them whatsoever, is unhelpful to such an inquiry.

Defendants have failed to demonstrate that the lack of a stay would sufficiently prejudice themselves or related entities. At the same time, the granting of a stay can be expected to delay the ultimate resolution of this case. The *Skellerup* Factors do not justify staying discovery.

### IV.   CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED THAT**:

1. Defendants' Motion to Stay Discovery in its entirety, or alternatively to stay any discovery not pertaining to the identification of Doe Defendants (ECF No. 39) is **DENIED**, except as to jurisdictional discovery.

2. All third-parties who have withheld further responses to pending discovery on the outcome of Defendants' Motion should resume production, or alternatively to move

////

////

3. to quash or for a protective order based on the merits of the specific discovery requests at issue.

**IT IS SO ORDERED.**

DATED: August 18, 2025

_____
SEAN C. RIORDAN
UNITED STATES MAGISTRATE JUDGE